I am David Lowery appearing on behalf of the appellant Mr. Kruchek. I was here at 9th Circuit six months or a year ago for an argument and it happened to be the day that the assisted suicide law was here for argument. One of the members of the panel commented that he wanted the lawyer to talk about jurisdiction saying that we know all the lawyers hate jurisdiction but we have to deal with it so please talk about it. I have the reverse situation today because I brought an equal protection issue and I think equal protection is an argument that all the lawyers love and all the judges hate so I'm the mean lawyer that's brought you the issue you don't really want to have. At TR, at transcript or excerpt page 160 there's a letter I sent to the ALJ before the hearing saying I want a medical advisor because we need a medical advisor if we are to carry our burden of proof for purposes of equaling the listings because the commissioner requires that the ALJ receive the testimony of a medical advisor if there is going to be a finding that someone does equal the listings. This court in previous decisions in Lester and Schneider has pointed out very good ways for claimants to demonstrate that they meet or equal listings. It will all be for naught if there is no medical advisor present because the commissioner will not allow the ALJ to find someone equals the listing. Can you make a proffer as to what, how your client met the listings? The client was retarded and the whole. I understand but in terms of the technical problem, which I understand is a set of criteria that you have to fit in, would you ever make a proffer as to how you fit? I don't quite understand your question. My understanding is that this isn't just a vague question of you have these characteristics that you have to demonstrate that you equal certain listings. Did you ever say what listing you equaled or how you equaled them? No. So what good would the medical examiner have done to confirm or deny something you never made? Well, one of the problems in that approach is, well, I could say that we think we equal the mental listings. There's no guarantee that the theory of the medical expert would be the same as my theory. They might have a completely different theory. And I've had that happen at hearings, too, where the judge and I think it's an orthopedic case and the ME decides it's a neurological case. There's no way to be sure what the medical advisor will seize on as significant. But we're the one. But after he wasn't there, after he wasn't there, in order for us to evaluate whether it mattered that he wasn't there, we have to have some idea what it is that you are claiming is the listing that you were equivalent to so we can see whether there's any chance that you could have succeeded with this. It would be the mental listings under the B criteria. The whole theory of the Lester case would apply here, too. There's testimony about anger control problems that would go on for hours, that would affect social functioning, that would affect activities of daily living, that would affect concentration, persistence, or pace. Those could be thought of as episodes of deterioration, all the elements of the B criteria. There's a reference in the questionnaire the doctor filled out for me with overwhelming depression being a problem that is so severe as to keep the person from working at all. The psychological part of the case, although not developed as well as it might be had he gotten better treatment, is nonetheless well-developed enough and with the lay evidence thrown on, too, it just adds to it. But there can be no finding that somebody equals a listing without the ALJ receiving medical testimony. The ALJ has a stranglehold on whether there's going to be an ME there or not, yet we're the ones with the burden of proof at steps one, two, three, and four. And at step three, while we could equal the listings and prove our case, the ALJ could not equal the listings by refusing to bring on an ME. Because if there's no ME testimony, it doesn't matter. We could introduce evidence from now until doomsday on equaling the listings, and the ALJ could not and would not be allowed to find equaling, because the volume of evidence that might point in that direction would be meaningless. The JLJ would be powerless to do it. And we are effectively denied the right to equal the listings if the ALJ decides he's not going to call an ME so we can do that. And in that letter I sent, one of the things I said is, if you won't call an ME to help me equal the listings at step three, then I object to you calling a VE to carry the Commissioner's burden of proof at step five. If the, in this case, was decided at step five. So if the Commissioner's burden of proof at step five were disregarded, then we took the position that since you didn't call the ME, you can't call the VE either, then we would win. And the whole case would be over at that point. We just have no way of carrying our burden of proof without the Commissioner or the ALJ calling the ME. We've got to have that to win. And we've got plenty of facts on metal here to equal, if not meet, the V criteria. But if there's no ME there, we're not going to be allowed to do it without regard to how strong or weak the case is. We could have an affidavit from the Pope, and it wouldn't make any difference. We would still be unsuccessful at equaling the listings because having the ME there is the sine qua non of equaling the listings. You can't equal the listings without having the ME. And for that reason, I would request that you... And what do you base your intention on that requires you to call the ME? It's a program requirement, and it's set forth in that letter at TR-160. I'm sorry, I'm not hearing you. Under what is it a program requirement? Well, just a second. It's in the letter at TR-160. It'll be in SSR-96-6P. Provides in part, however, long-standing policy requires the judgment of a physician or psychologist on the issue of equivalence on the evidence must be received. That's set out in page 160 in the transcript in the letter I sent in requesting the ME. And you can find a discussion of the law about that there. And that's what I brought up. It's a program requirement. That's what I brought you today, and I think I'll sit down. Thank you, counsel. Good morning, Your Honors. I'm Jeffrey Baird, representing the Commissioner. The state agency physicians reporting at pages 394 to 415 reviewed the record as a whole and fulfilled the Commissioner's obligation under 96-6P that a medical expert review the evidence. After that, the plaintiff's own treating physician presented the critical evidence in Exhibit 16F, which translates to roughly page 550, where he outlines very precise limitations and says, with low-stress work, the plaintiff can work. So the only role for a medical expert, and I always like them, but ALJs often have a burden with their scheduling, so they don't call them all the time. It is discretionary. The discretion is given in, I believe I cited in my brief, in 404-1527. Otherwise, 96-6P requires the state agency physicians. They did go through this record. There was no particular deterioration after their report in December of 1999, and they didn't find anything at the listings level. So that is really not an issue for the Court, it seems to me. I don't think that a medical expert would have been discretionary at this point. Also, Mr. Lowery hasn't given us a theory of how the impairments combine to meet or equal the listings. Under Lewis v. Apfel, I believe I cited in the red brief, there has to be some plausible theory put forward to how the listings might work. Let me change from this problem to another. What about... What did the ALJ do in the hypothetical with the mental impairments? Right. The ALJ reduced it to simple, repetitive work, I believe. But he didn't really deal with concentration issues as such. Well, but he put it in work-like terms, in terms that the V.E. could respond to. But wasn't the V.E. later asked whether he could do it if he couldn't have problems concentrating and said no? No. Specifically, Mr. Lowery asked the V.E., what about 16F? What about Exhibit 16F, those limitations? And the V.E. said, same jobs. So that did include a reference to low stress, for example, and it did include Dr. Chestnut's concerns about medication, the Silert. He felt it was very effective and it provided a basis to be able to go to work. But he also said that he couldn't take it, didn't take it, partly because of concern about physical side effects and also because of his mental, his ADHD, which were detail issues. Right. Dr. Chestnut expressed concern that the plaintiff might forget or might be distracted from taking it. I thought he said he wasn't taking it. No, he said he needed to take it. I believe, Your Honor, Dr. Chestnut said when he takes it, he can work and he needs to take it. Well, I guess I'd have to look exactly at page 550 or whatever it was. He said he wasn't currently working, but he didn't say he couldn't work. He didn't really say that either. That's a very ambiguous statement as to what he said about that. He just said not currently. I think the easiest reading is not currently working. But the limitations were set forth if he's on Silert, low stress jobs, a range of light work, that's all spelled out there. The concern was that he might not take his medication when he needed to. Interestingly enough, plaintiff admitted at the hearing, first of all, that he felt he could do sheet metal work. That's on transcript 72 or ER 70. He said the only reason he wasn't working is because he was going to school. Dr. Chestnut said there was noncompliance with medication regimes secondary to attention to detail. And he also said that it was difficult to maintain compliance with medication with significant side effects. And apparently Silert does have significant side effects. Well, it can. And the plaintiff testified that he wasn't taking it because of the side effects. Right, but he also testified on page 90 and 91 that he was enjoying school and doing very well at school and he was being given job offers and he said he could go to work except that he was doing all this hard work in schooling. And that was when he was off the Silert. But I think you're not reading Exhibit 16F the best, the best, most accurate way. He can work when he's on the Silert. Well, he also says he can work at a low-stress job when he's on the Silert. So the question is, will he take it or not? And we do have the lay testimony from his mother, for example, saying sometimes he doesn't. And then the plaintiff's own testimony is that he stopped but he still continued his schooling and it seems to be very successful anyway. Counsel, the Silert addresses the ADHD, is that correct? Right. And sleep. Are there alternatives to Silert? I'm not a doctor to say that. They did try some various medications and Silert was the most effective for this claimant. There may be others. In any event, the vocational expert responding to the limitations set forth in 16F said, same jobs. And the claimant worked like a hero at his schooling four to ten every night, taped classes, had small group sessions, was getting welding clerkship offers, so to speak. So whatever else is going on, as the mother said, when he wants to do something, he does it well. And it looks like he did. With that, I have nothing more, Your Honor. I found counsel's reference to the Silert at page 90. That's where the claimant testified it seemed to work for a while and then they told me to stop taking it because it would give me liver failure and kidney problems. So I've stopped taking it. With regard to what the treating physician... Whose testimony is this? Claimant's. He said he was taking it and it worked for a while and he was told to stop taking it because it would give me liver failure and kidney problems. So I've stopped taking it. Who's they? Presumably the doctors. Some doctor or medical person. No one questioned that at the hearing but a doctor would be the only person to logically say that to him, I would think. His doctor in the questionnaire, counsel says his doctor said he could work but his doctor, while checking capable of most express jobs, had a notation one spot up where he could have checked incapable of even most express jobs saying without medication or intermittent with regular medication. So apparently his ability to work with regular medication would have been intermittent. The doctor also says at page 553 inability to focus, ADHD, and non-compliance with medication regime is secondary to inattention to detail. Depression has been severe and incapacitating. Then farther down the page, severe ADHD and depression difficult to control on medication and difficult to maintain compliance on medication with significant side effects. So it sounds like it's not a problem of the claimant being difficult to recalcitrant it's just his condition is difficult to successfully treat. And his not taking medicine is related to the side effects all of which is independent of the more difficult legal protection issue that counsel didn't talk about very much. What about the welding school? Counsel says that he was able to do very well at welding, that he went to the courses  at welding. As I recall it the claimant was doing that 4 to 6 hours a day. He would take breaks. There was never anything from that that was equivalent to an 8 hour day, 40 hours a week. The fact that he had some success in the classwork learning how to weld would be kind of interesting and promising, but still doesn't get us to the finish line there. Welding is something that somebody who was inattentive to detail was going to do very well at. Eventually there would be a problem because of the concentration in the ADHD. He seemed to be doing okay at it. He hadn't burned anything up yet. He seemed to be doing okay at it. I assume that includes that he hadn't burned anything up yet. He seemed to be doing okay in the classroom context. He says he took welding for 3 terms. It was a 1 term class. It took me 3 terms to get it down, but after the 3rd term I got it down real good. It's just the way I learned. It takes me 2 times, 3 times to do something before I get it. It would take me 4 years to get a 2 year degree. Assume all of that's correct, what does that mean as far as being able to do a less difficult job? The vocational expert did not identify welding as one of the jobs he might be able to do. It's difficult to extrapolate that over to something else because the welding could have been something done and you do it for a minute or 2 and then you do something else for a minute or 2. There was no attempt to translate that over to some other kind of occupation where the physical aspects or the mental aspects might not be the same. Thank you. Thank you. The case just argued will be submitted. The next case for argument is Ledesma Galicia versus Alberto Gonzalez. Thank you.
judges: Reinhardt, Berzon, Bybee